**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KIMBERLY MOYE**, and **DAYJAH COLLINS**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**BJH HOLDING CORP** and **JACK'S FAMILY RESTAURANTS, LP**.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiffs Kimberly Moye and Dayjah Collins (Collectively "Plaintiffs") bring this Class Action Complaint against Defendants BJH Holding Corp (BJH) and Jack's Family Restaurants, LP. (Jack's), (Collectively "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action against Defendants for its failure to properly secure and safeguard personally identifiable information including, but not limited to, Plaintiffs' and Class Members' "name and Social Security Number"[1] (collectively, "PII" or "Private Information").

2. Defendant BJH Holding Corp is a holding corporation and the parent company of Jack's Family Restaurants. Defendant Jack's is a privately held fast-food restaurant chain

[1] Defendants' Notice of Data Breach, **Exhibit A**.

headquartered in Homewood, Alabama. Defendant Jack's operates over 200 locations across the southeastern United States, offering burgers, fried chicken, biscuits, and other Southern-style menu items.[2]

3. Defendants identified they were subject to a cyberattack between July 14, 2025, and August 10, 2025 (the "Data Breach"). Defendants investigated the Data Breach and confirmed that an unauthorized actor accessed Defendants' systems that day and had access to files that included the following: "name… and social security number."[3] Defendant acknowledged that the Data Breach affected current and former employees Personal Information, such as Plaintiffs and Class Members.

4. Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information was subjected to unauthorized access.

5. Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendants' computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus Defendants was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

6. Defendants, through its employees, disregarded the rights of Plaintiffs and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were

---

[2] Defendant Jack's "About Us" https://www.eatatjacks.com/pages/our-story/ (last accessed October 28, 2025).
[3] Defendant Jack's Notice of Data Breach, **Exhibit A**.

protected against unauthorized intrusions. Defendants also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

7. In addition, Defendants' employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendants' employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

8. Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct since the Private Information that Defendants collected and maintained is now in the hands of data thieves.

9. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10. Because of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11. Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

13. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

14. Accordingly, Plaintiffs brings this action against Defendants seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II. PARTIES

15. Plaintiff Kimberly Moye is a citizen of Dexter, Georgia and intends to remain there throughout this litigation.

16. Plaintiff Dayjah Collins is a citizen of Dothan, Alabama, and intends to remain there throughout this litigation.

17. Plaintiffs provided Defendants with their sensitive PII as a condition of obtaining employment with Defendants.

18. Defendant BJH Holding Corp is a New York based company, maintaining its principal place of business at 520 Madison Ave, New York, New York 10022.

19. Defendant Jack's is a Delaware limited partnership, maintaining its principal place of business at 124 W Oxmoor Road, Birmingham, Alabama 35209.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

interest and costs. The number of class members is unknown but presumed to include Defendants' thousands of current and former employees, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21. This Court has personal jurisdiction over Defendants because it operates, and is headquartered, in this District and conduct substantial business in this District.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(l) because a substantial part of the events giving rise to this action occurred in this District. Defendants is also based in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and has caused harm to Plaintiffs and Class Members from and/or in this District.

## III. FACTUAL ALLEGATIONS

### A. *DEFENDANTS' BUSINESS*

23. Defendant BJH Holding Corp is a holding corporation and the parent company of Jack's Family Restaurants. Defendant Jack's is a privately held fast-food restaurant chain headquartered in Homewood, Alabama. Defendant Jack's operates over 200 locations across the southeastern United States, offering burgers, fried chicken, biscuits, and other Southern-style menu items.[4]

24. Plaintiffs and Class Members include both former and current employees of Defendant.

25. In the ordinary course of obtaining employment with Defendant, Plaintiffs and Class Members were required to provide (and Plaintiffs did provide) Defendants with their sensitive, personal, and private information, such as his or their "name, date of birth, Social

[4] Defendant Jack's "About Us" https://www.eatatjacks.com/pages/our-story/ (last accessed October 28, 2025).

Security Number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name."[5]

26. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with its obligations to keep such information confidential and secure from unauthorized access.

27. By collecting and retaining the Private Information of Plaintiffs and Class Members for its own financial benefit, Defendants assumed an ongoing duty to implement and maintain reasonable safeguards to protect such information for unauthorized disclosure to third parties. This duty extended not only to safeguarding the information while in Defendants' possession, but also to the proper and secure disposal or destruction of the Private Information of former employees, such as Plaintiffs.

***B. The Data Breach***

28. A Data Breach occurs when unauthorized cyber criminals access a computer network system that has not been adequately and reasonably secured.

29. On or about October 21, 2025, Defendants mailed Plaintiffs a Notice of Data Security Incident[6] that stated in part:

> **What Happened?**
>
> Jack's recently identified unusual activity involving a cloud-based platform our company uses to store certain information about current and former employees. As soon as we became aware, we promptly began a thorough investigation with the support of cybersecurity specialists.
>
> The investigation determined that, between July 24, 2025, and August 10, 2025, an unauthorized individual obtained certain information from the platform. We then conducted an extensive review to understand what information was involved and which individuals may have been affected. We are reaching out to you because some of your information was stored on the platform at the time of the incident. At

[5] *See* Notice of Security Breach (**Exhibit A**).
[6] *Id.*

> this point, we have found no evidence of financial fraud as a result of this event, and we continue to monitor for any signs of fraud.
>
> **What Information was Involved?**
>
> Our investigation determined that your name and the following information related to you was contained on the platform at the time of the incident: Social Security number.

30. Defendant BJH provided notice of the Data Brach to the Office of the Maine Attorney General.[7]

31. Plaintiffs' notice letters were dated nearly three months after the Data Breach occurred.

32. Within this notice, Defendants failed to state whether it was able to contain or end the cybersecurity threat, leaving victims in fear of their Private Information being leaked to the public or offered for sale to the public by data brokers and whether their Private Information that Defendants continues to maintain is secure. Defendants also failed to state how the breach itself occurred. All this information is vital to victims of a data breach due to the sensitivity, importance and value of the Private Information compromised in this specific breach.

33. Plaintiffs and Class Members provided Defendants with their Private Information reasonably expecting and belief that Defendants had implied a promise and accepted the responsibility to keep such information confidential and secure from unauthorized access as part of their contract to do business together.

34. Defendants' data security obligations were particularly important given the substantial increase in Data Breaches in the financial services industry preceding the date of the breach.

[7] Office of the Maine Attorney General, "Data Breach Notifications" https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e1179031-c25a-4111-9c02-915fb23cf30f.html (last accessed October 28, 2025).

35. In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[8] Of the 2023 recorded data breaches, 744 of them, or 23%, were in the financial services industry.[9] The 744 reported breaches reported in 2023 exposed nearly 61 million sensitive records. This is up from 2022 where there were a reported 269 breaches that exposed approximately 27 million sensitive records in.[10]

36. Data breaches such as the one experienced by Defendants have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

37. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

C. ***DATA BREACHES ARE PREVENTABLE***

38. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

39. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

40. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[11]

---

[8] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited October 28, 2025).
[9] *Id.*
[10] *Id*. at 11, Fig.3.
11 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited October 28, 2025).

41. To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the

AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[12]

42. To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

[12] *Id.* at 3-4.

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[13]

43. Given that Defendants was storing the Private Information of Defendants' current and former employees, Defendants could and should have implemented all the above measures to prevent and detect cyberattacks.

44. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class Members.

### *D. Defendants Acquire, Collect & Store current and former employees' Private Information*

45. Defendants acquire, collects, and stores Private Information of its current and former employees.

46. As a condition of obtaining employment with Defendant, Defendants require their employees to entrust it with highly sensitive personal information.

47. By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

[13] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed October 28, 2025).

48. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted Defendant, absent a promise to safeguard that information.

49. Defendants promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

50. Plaintiffs and the Class Members, relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *E. Value Of Private Information*

51. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

52. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[16]

---

[14] 17 C.F.R. § 248.201 (2013).

[15] *Id.*

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

53. For example, Personal Information can be sold at a price ranging from $40 to $200.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18] Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

54. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

55. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

---

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[18] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

56. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

57. Defendants knew or should have known of the risks and strengthened its data systems accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### *F. DEFENDANTS FAIL TO COMPLY WITH FTC GUIDELINES*

58. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

59. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal Private Information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[19]

60. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

---

[19] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited October 28, 2025).

[20] *Id*.

61. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

62. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect the Private Information in their possession by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[emphasis added].

63. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

64. These FTC enforcement actions include actions against entities like Defendant. See, e.g., In the Matter of LabMD, Inc., A Corp, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

65. Defendants failed to properly implement basic data security practices.

66. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to current and former employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

67. Defendants were always fully aware of its obligation to protect the PII of its current and former employees. Defendants were also aware of the significant repercussions that would result from its failure to do so.

### *G. Defendants Fail to Comply with Industry Standards*

68. As shown above, experts studying cyber security routinely identify professional businesses and their affiliates as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

69. Several best practices have been identified that a minimum should be implemented by entities like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

70. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

71. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

72. These foregoing frameworks are existing and applicable industry standards in the industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### *H. Plaintiffs and the Class Members Have and Will Experience Substantial Harm*

73. Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

74. The ramifications of Defendants' failure to keep Plaintiffs' and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

75. Because of Defendants' failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;
- The diminution in value of their PII;
- The compromise and continuing publication of their PII;
- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and
- The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake the appropriate measures to protect the PII in its possession.

76. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

77. The value of Plaintiffs' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

78. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

79. One such example of criminals using PII for profit is the development of "Fullz" packages.

80. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

81. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that

Plaintiffs' and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

82. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

83. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendants did not rapidly report to Plaintiffs and the Class that their PII had been stolen.

84. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

85. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

86. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

87. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and

amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[21]

88. The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;
- retaining payment card information only as long as necessary;
- properly disposing of personal information that is no longer needed;
- limiting administrative access to business systems;
- using industry-tested and accepted methods for securing data;
- monitoring activity on networks to uncover unapproved activity;
- verifying that privacy and security features function properly;
- testing for common vulnerabilities; and
- updating and patching third-party software.

89. According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. 22

90. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

---

[21] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited October 28, 2025).

[22] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited October 28, 2025).

91. Defendants' failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

92. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

### *I. Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft*

93. Data Breaches such as the one experienced by Defendants are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

94. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."23

95. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[24]

96. Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

97. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name

[23] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited October 28, 2025) ("GAO Report").
[24] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited October 28, 2025).

and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

98. Theft of Private Information is gravely serious. PII is a valuable property right.[25] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

99. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

100. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

---

[25] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

101. There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

102. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[26]

103. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

104. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[27]

105. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[28]

106. Each of these fraudulent activities is difficult to detect. An individual may not know that his or their Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

107. It is also hard to change or cancel a stolen Social Security number.

---

[26] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited October 28, 2025).

[27] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited October 28, 2025).

[28] *Id* at 4.

108. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."29

109. Defendants therefore knew or should have known this and strengthened its data systems accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## IV. DEFENDANTS' BREACH

110. Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for

---

[29] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 31, 2025).

identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as reception desk computers, even after discovery of the data breach.

111. As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

112. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

## V. PLAINTIFFS' EXPERIENCE

113. Plaintiff Kimberly Moye is and at all times mentioned herein was an individual citizen of Georgia, residing in the city of Dexter.

114. Plaintiff Dayjah Collins is and at all times mentioned herein was an individual citizen of Alabama, residing in the city of Dothan.

115. Plaintiffs provided Defendants with their sensitive PII as a condition of obtaining employment with Defendant. Plaintiffs received notice of the Data Breach on or around October 21, 2025, informing them that their sensitive information was part of Defendants' Data Breach (**Exhibit A**).

116. Plaintiffs are careful about sharing their sensitive Private Information. Plaintiffs have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

117. Plaintiffs store any documents containing their sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiffs diligently chooses unique usernames and passwords for their sensitive online accounts.

118. Had Plaintiffs been aware that Defendants' computer systems were not secure, they would not have entrusted her personal data to Defendant.

119. Because of the Data Breach, Defendants advised Plaintiffs to take certain steps to protect their Private Information and otherwise mitigate their damages.

120. Because of the Data Breach, Plaintiffs spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring their accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendants' direction by way of the Data Breach notice where Defendants recommended that Plaintiffs mitigate their damages by, among other things, monitoring their accounts for fraudulent activity.

121. Even with the best response, the harm caused to Plaintiffs cannot be undone.

122. Plaintiffs suffered actual injury in the form of damages to and diminution in the value of Plaintiffs' Private Information—a form of intangible property that Plaintiffs entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiffs suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of their privacy.

123. Plaintiffs have suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

124. Plaintiffs have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

## VI. PLAINTIFFS AND CLASS MEMBERS DAMAGES

125. To date, Defendants have done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendants have only offered inadequate identity monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

126. The credit monitoring services offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What's more, Defendants places the burden on Plaintiffs and Class Members by requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

127. Defendants' credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendant, to investigate and protect themselves from Defendants' tortious acts resulting in the Data Breach.

128. Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

129. Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

130. Plaintiffs and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

131. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

132. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

133. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

134. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

135. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

136. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

137. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

138. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

139. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

140. Further, because of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

141. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII. CLASS ALLEGATIONS

142. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

143. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **All persons whose Private Information was actually or potentially accessed or acquired during the July-August 2025 Data Breach (the "Class").**

144. Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

145. Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

146. Numerosity, Fed R. Civ. P. 23(a)(l): Class Members are so Many that joinder of all members is impracticable. Upon information and belief, there exceed 10,000 individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendants' records.

147. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact

common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendants had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e. When Defendants learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

k. Whether Defendants violated the consumer protection statutes invoked herein;

l. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages because of Defendants' wrongful conduct;

m. Whether Plaintiffs and Class Members are entitled to restitution because of Defendants' wrongful conduct; and

n. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of the Data Breach.

148. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other

Class Members because all had their PII compromised because of the Data Breach, because of Defendants' misfeasance.

149. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged here apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct toward the Class as a whole, not on facts or law applicable only to Plaintiff.

150. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs has suffered are typical of other Class Members. Plaintiffs has also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

151. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged here; it will permit many Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for

those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

152. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

153. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

154. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

155. Unless a Class-wide injunction is issued, Defendants may continue in its failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

156. And Defendants has acted or refused to act on grounds generally applicable to the Classes and thus final injunctive or corresponding declaratory relief for the Class Members is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

157. Likewise, issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendants failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendants on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendants breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members; and

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief because of Defendants' wrongful conduct.

## VIII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Putative Rule 23 Class)

158. Plaintiffs and the Class repeat and re-allege every allegation as if fully set forth herein.

159. Plaintiffs and the Class entrusted Defendants with their Private Information.

160. Plaintiffs and the Class entrusted their Private Information to Defendants on the premise and with the understanding that Defendants would safeguard their information, use their PII for employment purposes only, and/or not disclose their Private Information to unauthorized third parties.

161. Defendants know about the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

162. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

163. Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that the Private Information of Plaintiffs and the Class Members in Defendants' possession was adequately secured and protected.

164. Defendants also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under regulations.

165. Defendants also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiffs and the Class.

166. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential Private Information, a necessary part of obtaining services from Defendant.

167. Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs or the Class.

168. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly given Defendants' inadequate security practices.

169. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

170. Defendants' own conduct created a foreseeable risk of harm. to Plaintiffs and the Class. Defendants' misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach asset forth herein. Defendants' misconduct also included its decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiffs and the Class, including basic encryption techniques freely available to Defendant.

171. Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

172. Defendants were able to protect against the harm suffered by Plaintiffs and the Class because of the Data Breach.

173. Defendants had and continue to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Info by third parties.

174. Defendants had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiffs and the Class.

175. Defendants have admitted that the Private Information of Plaintiffs and the Class were wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

176. Defendants, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and the Class during the time the Private Information was within Defendants' possession or control.

177. Defendants improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

178. Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiffs and the Class in the face of increased risk of theft.

179. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

180. Defendants breached its duty to exercise appropriate clearinghouse practices by failing to remove Private Information it was no longer required to retain under regulations.

181. Defendants, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the Data Breach.

182. But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the Private Information of Plaintiffs and the Class would not have been compromised.

183. There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

184. Additionally, Section 5 of the FTC Act prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

185. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as detailed herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

186. Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

187. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

188. The harm attributable to the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

189. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiffs and the Class; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiffs and the Class.

190. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not

limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

191. Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

192. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have a right to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Putative Rule 23 Class)**

193. Plaintiffs and the Class repeat and re-allege every allegation as if fully set forth herein.

194. Plaintiffs and the Class entrusted their Private Information to Defendants. In so doing, Plaintiffs and the Class entered implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if its data had been breached and compromised or stolen.

195. In its Privacy Policy, Defendants represented that it would not disclose Plaintiffs and Class Members' Private Information to unauthorized third parties.

196. 20S. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendants.

197. Defendants breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of

Plaintiffs and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that their personal information was compromised because of the Data Breach.

198. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

199. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class have a right to recover actual, consequential, and nominal damages.

## COUNT III
## UNJUST ENRICHMENT
## (On behalf of Plaintiffs and the Putative Rule 23 Class)

200. Plaintiffs and the Class repeat and re-allege every allegation as if fully set forth herein.

201. Plaintiffs and Class Members conferred a monetary benefit on Defendant, by providing Defendants with their valuable Private Information.

202. Defendants enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

203. Rather than provide a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid its data security obligations at the expense of

Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

204. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

205. Defendants acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

206. If Plaintiffs and Class Members knew that Defendants had not secured their PII, they would not have agreed to provide their PII to Defendant.

207. Plaintiffs and Class Members have no adequate remedy at law.

208. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Private Information in its continued possession and (vii) future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the

effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiffs and Class Members.

209. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

210. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them.

## IX. PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs, on behalf of themselves and the Class described above seeks the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendants to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendants' wrongful conduct;

e. For an order directing Defendants to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 29, 2025

Respectfully submitted,

*/s/ Alyssa Tolentino*
Alyssa Tolentino
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: atolentino@sirillp.com

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
Service Only: service@eksm.com
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**
(* denotes *pro hac vice* forthcoming)

# EXHIBIT A

Jack's Family Restaurants, LP
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMLC6100300121
KIMBERLY DENISE MOYE
[redacted]

October 21, 2025

Dear KIMBERLY MOYE:

Jack's Family Restaurants LP ("Jack's") is writing to make you aware of a matter that may affect some of your information. This notice provides information about what happened, steps we have taken in response, and resources available to you to help protect your information, should you feel it appropriate to do so.

**What Happened?** Jack's recently identified unusual activity involving a cloud-based platform our company uses to store certain information about current and former employees. As soon as we became aware, we promptly began a thorough investigation with the support of cybersecurity specialists.

The investigation determined that, between July 24, 2025, and August 10, 2025, an unauthorized individual obtained certain information from the platform. We then conducted an extensive review to understand what information was involved and which individuals may have been affected. We are reaching out to you because some of your information was stored on the platform at the time of the incident. At this point, we have found no evidence of financial fraud as a result of this event, and we continue to monitor for any signs of fraud.

**What Information Was Involved?** Our investigation determined that your name and the following information related to you was contained on the platform at the time of the incident: Social Security number.

***What We Are Doing.*** In response to this matter, we promptly took steps to secure the platform, conduct a thorough investigation, review the information contained on the platform, and notify potentially affected individuals. As an added precaution, we are offering you access to 12 months of complimentary credit monitoring and identity theft protection services through TransUnion. If you wish to activate these services, please follow the instructions included in the enclosed ***Steps You Can Take To Help Protect Personal Information*** section of this letter. We recognize the evolving nature of cyber security and will continue to evaluate and enhance our technical policies and procedures in the future.

***What You Can Do.*** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. Individuals may also review the ***Steps You Can Take To Help Protect Personal Information*** section of this letter. Further, individuals may enroll in the complimentary monitoring services we are offering. Please note, due to privacy restrictions, we are unable to automatically enroll you in the complimentary monitoring services, if you wish to receive the monitoring services, you must follow the enclosed enrollment instructions.

Jack's Family Restaurants, LP
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMLC6100305397
DAYJAH COLLINS
[redacted]

October 21, 2025

PMLC6100305397053970102K0400

Dear DAYJAH COLLINS:

Jack's Family Restaurants, LP ("Jack's") is writing to make you aware of a matter that may affect some of your information. This notice provides information about what happened, steps we have taken in response, and resources available to you to help protect your information, should you feel it appropriate to do so.

**What Happened?** Jack's recently identified unusual activity involving a cloud-based platform our company uses to store certain information about current and former employees. As soon as we became aware, we promptly began a thorough investigation with the support of cybersecurity specialists.

The investigation determined that, between July 24, 2025, and August 10, 2025, an unauthorized individual obtained certain information from the platform. We then conducted an extensive review to understand what information was involved and which individuals may have been affected. We are reaching out to you because some of your information was stored on the platform at the time of the incident. At this point, we have found no evidence of financial fraud as a result of this event, and we continue to monitor for any signs of fraud.

**What Information Was Involved?** Our investigation determined that your name and the following information related to you was contained on the platform at the time of the incident: Social Security number.

**What We Are Doing**. In response to this matter, we promptly took steps to secure the platform, conduct a thorough investigation, review the information contained on the platform, and notify potentially affected individuals. As an added precaution, we are offering you access to 12 months of complimentary credit monitoring and identity theft protection services through TransUnion. If you wish to activate these services, please follow the instructions included in the enclosed ***Steps You Can Take To Help Protect Personal Information*** section of this letter. We recognize the evolving nature of cyber security and will continue to evaluate and enhance our technical policies and procedures in the future.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. Individuals may also review the ***Steps You Can Take To Help Protect Personal Information*** section of this letter. Further, individuals may enroll in the complimentary monitoring services we are offering. Please note, due to privacy restrictions, we are unable to automatically enroll you in the complimentary monitoring services, if you wish to receive the monitoring services, you must follow the enclosed enrollment instructions.